COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Elder, Frank, Humphreys, Clements, Kelsey, McClanahan,
           Haley, Petty and Beales
Argued at Richmond, Virginia


CRAIG M. LANTION
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2617-05-4                      JUDGE JAMES W. HALEY, JR.
                                                         DECEMBER 18, 2007
COMMONWEALTH OF VIRGINIA


                             UPON REHEARING EN BANC

                   FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                             Gaylord L. Finch, Jr., Judge

          Laura E. Byrum (Petrovich & Walsh, P.L.C., on brief), for appellant.

          Kathleen B. Martin, Senior Assistant Attorney General (Robert F.
          McDonnell, Attorney General, on brief), for appellee.


        A jury convicted Craig M. Lantion of possessing cocaine.  On appeal, Lantion argues the

trial court erred by not granting his pretrial motion to suppress.  A panel of our Court agreed with

Lantion and reversed his conviction.  Upon rehearing this matter *en banc*, we conclude that the

trial court did not err in denying Lantion's motion to suppress.  We thus affirm Lantion's

conviction.

                                           I.

        On appeal, we address the legal issues arising from a suppression motion "only after the

relevant historical facts have been established."  Logan v. Commonwealth, 47 Va. App. 168,

171, 622 S.E.2d 771, 772 (2005) (*en banc*).  We review the facts developed in the trial court "in

the light most favorable to the Commonwealth, giving it the benefit of any reasonable

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

inferences." Kyer v. Commonwealth, 45 Va. App. 473, 477, 612 S.E.2d 213, 215 (2005) (*en banc*) (citation omitted).

So viewed, the evidence showed that Officer Swartz received a report of domestic violence at 10:30 a.m. on New Year's Day. He arrived at the residence seven minutes later and was invited into the living room by the woman who had made the report. She explained that she, her boyfriend, and his friend had been having a party to celebrate the New Year. She claimed her boyfriend assaulted her when she refused to have sex with his friend in exchange for cocaine. Her boyfriend left the apartment, she added, before the officer arrived.

While the woman explained what had happened, she maintained eye contact with the officer. When Officer Swartz asked her whether anyone else was still in the residence, however, she immediately "looked away" and began curiously "moving back and forth." Appearing nervous and disheveled, she gave no answer to the officer's question. He asked again. She finally replied that "somebody" was in the bedroom. Officer Swartz again followed up, asking exactly who was in the bedroom. She said "C" and could not provide a full name.

The woman walked the officer back to the bedroom door. The door was closed. It had a fist-sized hole punched all the way through the door by the doorknob. Officer Swartz opened the door and observed a fully clothed adult male lying on top of the bed, apparently sleeping. Swartz woke him and asked him "numerous times" to identify himself. He refused to do so. The woman interjected that "he was not involved." Swartz then asked him if he had any weapons in his possession. He said he had a knife.

Suspecting the unidentified man to be the boyfriend's "friend" involved in the earlier sex-for-drugs scheme, Officer Swartz detained the man and simultaneously frisked him for weapons. Officer Swartz felt an object in the man's right pocket which he believed to be a knife. Swartz emptied the pocket and found a knife. He felt another object in the man's left pocket. He

- 2 -

reached into that pocket and "grabbed everything in the pocket and pulled it all out." Everything came out "in one big handful" — a second knife, money, and a rock of cocaine. Officer Swartz arrested the man, later identified as Lantion, for possessing cocaine.

## II.

"Though the ultimate question whether the officers violated the Fourth Amendment triggers *de novo* appellate scrutiny, we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" Slayton v. Commonwealth, 41 Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003) (citation omitted). "To prevail on appeal, 'the defendant must show that the trial court's denial of his suppression motion, when the evidence is considered in the light most favorable to the prosecution, was reversible error.'" Id. at 105, 582 S.E.2d at 450 (quoting Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003)).

At his suppression hearing, Lantion argued that Officer Swartz unlawfully detained him and frisked him for weapons. These constitutional violations were compounded, Lantion contends, when Officer Swartz exceeded the proper scope of a weapons frisk by pulling cocaine out of Lantion's pocket. The trial court rejected each of these arguments, as do we.

### (a)  OFFICER SWARTZ'S SEIZURE OF LANTION

Before addressing whether Lantion's seizure was unlawful, we must first determine when it took place.[1] Lantion asserts that his detention occurred "the instant" Officer Swartz "walked into the bedroom of the private residence where Lantion was asleep and woke Lantion by identifying himself as a police officer." At that point, however, Officer Swartz was an invited

---

[1] Lantion claims the Commonwealth conceded in the trial court the officer seized him merely by entering the room. We read the record to show only that the Commonwealth conceded there was an investigatory detention, not that it occurred the moment the officer entered the room.

guest in the apartment and had been escorted to the bedroom by the victim. Officer Swartz did not, by his mere presence, seize every occupant of the apartment. Nor did he seize Lantion by simply asking him for his identity. As long as an officer refrains from inducing cooperation by coercive means, he needs no suspicion of criminality to "'pose questions'" or "'ask for identification'" from an otherwise undetained suspect. Barkley v. Commonwealth, 39 Va. App. 682, 691, 576 S.E.2d 234, 238 (2003) (quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).[2]

No evidence of coercion exists in this record. Officer Swartz did not draw his weapon, corner Lantion in the room, order Lantion not to move, or in any way threaten Lantion physically or verbally. Nor did he make a display of authority simply by being present in the room. We accept that, from Lantion's subjective perspective, he may have been intimidated simply by being in the same room with a police officer in the midst of an ongoing investigation. The objective reasonable person standard, however, "presupposes an *innocent* person." Florida v. Bostick, 501 U.S. 429, 438 (1991) (emphasis in original); see also Baldwin v. Commonwealth, 243 Va. 191, 197, 413 S.E.2d 645, 648 (1992); Barkley, 39 Va. App. at 692, 576 S.E.2d at 239. An innocent person — which, in this case, would be someone without cocaine in his pocket — would not have felt the unique anxieties weighing upon Lantion.

For these reasons, we reject Lantion's argument that Officer Swartz seized him by entering the bedroom and rousing him from sleep. Under settled law, "a seizure occurs when a law enforcement officer, by physical force or some display of authority, restrains in some manner a citizen's freedom of movement. Only when such restraint is imposed is there a basis for invoking Fourth Amendment safeguards." McCain v. Commonwealth, 261 Va. 483, 490-91,

---

[2] See also McLellan v. Commonwealth, 37 Va. App. 144, 151, 554 S.E.2d 699, 702 (2001); Commonwealth v. Satchell, 15 Va. App. 127, 131, 422 S.E.2d 412, 415 (1992).

for purposes of the weapons frisk.  It is at that point we must judge the lawfulness of the investigatory detention.

(b)  R<span style="font-variant:small-caps">EASONABLE</span> S<span style="font-variant:small-caps">USPICION</span> J<span style="font-variant:small-caps">USTIFYING</span> L<span style="font-variant:small-caps">ANTION'S</span> S<span style="font-variant:small-caps">EIZURE</span>

As its text makes clear, the Fourth Amendment "does not proscribe all seizures, only those that are 'unreasonable.'"  Barkley, 39 Va. App. at 691, 576 S.E.2d at 238 (citations omitted).  While an arrest requires probable cause, a mere investigatory stop requires only a "reasonable suspicion" that criminal activity "may be afoot."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989), and Terry v. Ohio, 392 U.S. 1, 30 (1968)).  The likelihood of criminality "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard" applicable in other contexts.  Id. at 274 (citing Sokolow, 490 U.S. at 7).  Thus, "'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'"  Baldwin, 243 Va. at 195, 413 S.E.2d at 647 (quoting Terry, 392 U.S. at 22).

To be sure, "the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal — to enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges."  4 Wayne R. LaFave, Search and Seizure § 9.5(b), at 482 (4th ed. 2004) (citations and footnote omitted).  In some cases, a "'brief stop of a suspicious individual, in order to determine his identity or to maintain the *status quo* momentarily while obtaining more information'" may represent the most reasonable response an officer can give under the circumstances.  Simmons v.

- 5 -

Commonwealth, 217 Va. 552, 554-55, 231 S.E.2d 218, 220 (1977) (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).[3]

Equally important, we must consider the "totality of the circumstances — the whole picture," Baldwin, 243 Va. at 199, 413 S.E.2d at 649 (citation omitted), and not employ the rejected "divide-and-conquer" approach, Arvizu, 534 U.S. at 274, sometimes used to separate a composite fact pattern into a series of seemingly innocuous details. The factual circumstances in aggregate, not in isolation, determine the reasonableness of a police officer's actions. Id.

Approaching the factual record from that vantage point, we believe the totality of the circumstances justified a reasonable suspicion that Lantion was the second male (the boyfriend's "friend") involved in the earlier sex-for-drugs scheme. At the time he seized Lantion, Officer Swartz knew the following:

- The victim reported she had been assaulted for refusing to participate in the sex-for-drugs scheme. She was to provide the sex; her boyfriend's "friend" was to provide the drugs.

- The victim's report was made only minutes before Officer Swartz arrived on the scene, increasing the likelihood that either the boyfriend or his friend might still be present.

- The victim refused to answer when Officer Swartz asked whether anyone else was in the apartment. She conspicuously looked away and nervously began to rock back and forth as the question was repeated several times.

- When the victim finally answered, she gave a cryptic reply and identified the unknown man only as "C."

- The victim said her boyfriend was not present in the apartment, leaving Officer Swartz to suspect "C" could be the second male involved in the sex-for-drugs scheme.

---

[3] In addition, "an officer need not suspect an individual of a particular crime in order to justify a Terry stop." Alston v. Commonwealth, 40 Va. App. 728, 738, 581 S.E.2d 245, 250 (2003) (citation omitted). "A general suspicion of some criminal activity is enough," id., to satisfy the reasonable suspicion standard.

- A fist-size hole was next to the knob of the closed bedroom door, suggesting physical force had been used to open a locked door.

- The unidentified "C" repeatedly refused to identify himself. He had no hesitation, however, freely admitting he was armed with a knife.

- The domestic assault victim (after first refusing to tell Officer Swartz whether there was anyone else in the apartment and then, after capitulating, overhearing "C" persistently refuse to identify himself) sought to avoid further questioning of "C" by volunteering that "he was not involved."

Given these circumstances, a reasonably prudent police officer would have ample justification to briefly detain "C" to investigate the situation further. It would hardly be reasonable for an officer to simply shrug his shoulders, walk away from a domestic assault investigation, and leave an obviously fearful victim alone in an apartment with an armed man whom she could not (or would not) identify. Nor would it be reasonable to expect the officer to complete his investigation while in close quarters with an armed man who refuses to identify himself.

> Identity may prove particularly important in cases such as this, where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.

Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004).

Lantion makes much over the fact that the victim attempted to abort Officer Swartz's continuing investigation of "C" by volunteering that "he was not involved." That should have ended any reasonable suspicion, Lantion contends. Experienced officers know better. "In domestic violence situations, officers may reasonably consider whether the victim is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes." Fletcher v. Town of Clinton, 196 F.3d 41, 52 (1st Cir. 1999); see also United States v. Brooks,

367 F.3d 1128, 1137 (9th Cir. 2004) (noting that "a victim of domestic violence may deny an assault, especially when an abuser is present"); United States v. Bartelho, 71 F.3d 436, 442 (1st Cir. 1995) (noting "the police were not required" to take the victim's statements at "face value," given "her demeanor" and "their training regarding domestic violence"). Officer Swartz, therefore, had reasonable suspicion to detain Lantion for further questioning.

(c)  WEAPONS FRISK — "ARMED AND DANGEROUS"

Even if Officer Swartz had reasonable suspicion to briefly detain him, Lantion argues the officer went too far in frisking him for weapons. We disagree.

A police officer need not "establish that it was more probable than not that the suspect was armed," LaFave, supra § 9.6(a), at 621-22, but only that the suspect "may be armed and dangerous," El-Amin v. Commonwealth, 269 Va. 15, 20, 607 S.E.2d 115, 117 (2005). Indeed, an officer need not be "absolutely certain" the suspect was even armed in the first place. El-Amin, 269 Va. at 22, 607 S.E.2d at 118; see also Simmons v. Commonwealth, 217 Va. 552, 556, 231 S.E.2d 218, 221 (1977) (holding that a weapons frisk may be conducted if the officer "reasonably believes that the individual might be armed"). Instead, the focus remains on whether a reasonably prudent officer "'would be warranted in the belief that his safety or that of others is in danger.'" El-Amin, 269 Va. at 22, 607 S.E.2d at 118 (quoting Terry, 392 U.S. at 27).

We need not address Lantion's argument on this point in any detail. While repeatedly refusing to identify himself, Lantion openly admitted possessing a knife. Officer Swartz needed no more information than this (when coupled with the preexisting, reasonable suspicion that criminality may be afoot) to have a sufficient belief that his safety or the safety of the victim could be in danger. Though Officer Swartz did not see the concealed knife, or have it brandished in his face, he need not "'await the glint of steel before he can act to protect his safety.'" State v.

Cobbs, 711 P.2d 900, 907 (N.M. Ct. App. 1985) (quoting People v. Benjamin, 414 N.E.2d 645, 648 (N.Y. 1980)).[4]

Under these circumstances, we cannot say the weapons frisk "was the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment; the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." Terry, 392 U.S. at 28. The trial court, therefore, did not err in ruling that Officer Swartz had an adequate basis for frisking Lantion for the knife he admittedly possessed.

(d) SCOPE OF WEAPONS FRISK

Finally, Lantion argues that the officer exceeded the lawful scope of a weapons frisk by emptying his pocket of various items (including a rock of cocaine) rather than removing just the knife. We again disagree with Lantion.

Under our standard of review, we address the legal issues arising from a suppression motion "only after the relevant historical facts have been established." Logan v. Commonwealth, 47 Va. App. 168, 171, 622 S.E.2d 771, 772 (2005) (*en banc*). On appeal, the facts developed in the trial court must be reviewed "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences." Kyer, 45 Va. App. at 477, 612 S.E.2d at 215 (citation omitted).

The trial court found that Officer Swartz inadvertently discovered the cocaine in the process of obtaining the knife. When "the act of reaching into the pocket and removing the contents is essentially a single act," we believe "it is unrealistic to require the officer to

---

[4] See, e.g., State v. Schneider, 389 N.W.2d 604, 605 (N.D. 1986); Cobbs, 711 P.2d at 907; People v. Moore, 295 N.E.2d 780, 783-84 (N.Y. 1973); State v. Lackey, 444 N.E.2d 1047, 1049 n.2 (Ohio Ct. App. 1981) (holding "it is not necessary that the officer know as a matter of fact that the accosted individual is 'presently dangerous' independently of the belief that he has a weapon on his person or ready at hand").

re-evaluate the available facts after putting his hand into the pocket." LaFave, <u>supra</u> § 9.6(d), at 670. To "impose such a requirement would constitute a 'fine tuning' of Fourth Amendment requirements without any appreciable gain." <u>Id.</u> And it would be quite "impracticable for the officer to withdraw the suspected item from the pocket without pulling out other objects as well." <u>Id.</u> For this reason, it was within the scope of the weapons frisk for Officer Swartz to reach into Lantion's pocket and "remove the contents." <u>See</u> <u>United States v. Dowling</u>, 271 A.2d 406, 408 (D.C. 1970).

III.

The trial court properly denied Lantion's motion to suppress. Reasonable suspicion supported Officer Swartz's decision to detain Lantion and to frisk him for weapons. The frisk did not exceed its proper scope. We thus affirm Lantion's conviction.

<u>Affirmed.</u>

Elder, J., with whom Humphreys, J., joins, dissenting.

I respectfully dissent. I believe the evidence fails to establish the arresting officer had reasonable, articulable suspicion to detain Craig Lantion when the officer entered the bedroom where Lantion was sleeping and that the officer's discovery of drugs in Lantion's pocket was the fruit of that unreasonable seizure. Accordingly, I would hold the trial court's denial of the motion to suppress was error, and I would reverse Lantion's conviction.

On appeal of a ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, granting to the evidence all reasonable inferences fairly deducible therefrom. Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc); see McCain v. Commonwealth, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001). However, we review *de novo* the trial court's application of defined legal standards, such as whether the police had reasonable suspicion for a seizure. Ornelas v. United States, 517 U.S. 690, 699 (1996). Our review of the existence of reasonable suspicion involves application of an objective rather than subjective standard. See, e.g., Whren v. United States, 517 U.S. 806, 812-13 (1996); see also Robinson v. Commonwealth, 273 Va. 26, 35-38, 639 S.E.2d 217, 222-24 (2007).

An encounter with a police officer constitutes a seizure for Fourth Amendment purposes "[i]f . . . a reasonable person would not feel free to decline an officer's requests or would not feel free to leave." Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003) (citing United States v. Mendenhall, 446 U.S. 544, 558-59 (1980)); see also Florida v. Bostick, 501 U.S. 429, 438 (1991) (noting, in context of determining whether suspect was illegally seized, that

- 11 -

"[t]he 'reasonable person' test presupposes an innocent person").  Such a seizure is reasonable under the Fourth Amendment as a <u>Terry</u> stop, i.e., a "brief, minimally intrusive investigatory detention[]," <u>Wechsler v. Commonwealth</u>, 20 Va. App. 162, 169, 455 S.E.2d 744, 747 (1995) (citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)), if the officer conducting the stop is aware of facts that "lead[] him reasonably to believe in light of his experience that criminal activity may be afoot" and, importantly, that the person he detains is involved in it, <u>Terry</u>, 392 U.S. at 30.  When a police officer detains an individual "for the purpose of requiring him to identify himself, [the officer has] performed a seizure of his person subject to the requirements of the Fourth Amendment."  <u>Brown v. Texas</u>, 443 U.S. 47, 50 (1979).

"[T]he likelihood of criminal activity [required for a <u>Terry</u> stop] need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002).  Nevertheless, an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch."'"  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) (quoting <u>Terry</u>, 392 U.S. at 27); <u>see</u> <u>Arvizu</u>, 534 U.S. at 274.

> [T]o assure that an individual's reasonable expectation of privacy is not subjected to arbitrary invasions solely at the unfettered discretion of officers in the field, . . . the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of *the particular individual* . . . .

<u>Brown</u>, 443 U.S. at 51 (emphasis added) (citation omitted).  A person's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  <u>Wardlow</u>, 528 U.S. at 119.

Applying these standards, I would hold that Lantion was seized when he awoke New Year's morning, in a room "so small that it's just about the size of a king-size bed," to find a uniformed police officer standing two to three feet away and demanding over and over to know

his name and whether he had a weapon. Under these circumstances, no reasonable person—innocent or otherwise—would have felt free to leave or to ignore the officer's questions about whether he was armed.[5] See Mendenhall, 446 U.S. at 558-59. Further, when Officer Swartz effected this seizure, he lacked reasonable, articulable suspicion to believe that Lantion was involved in any criminal activity. When Officer Swartz responded to Ms. Mauldin's 911 "domestic assault" call, Mauldin reported that while she, her boyfriend Benny Bowles, and his friend were having a New Year's party, Bowles battered her because she refused to participate in an arrangement he had made for her to have sex with the friend in exchange for cocaine. Officer Swartz testified Mauldin made eye contact and was straightforward in her dealings with him, and Mauldin gave him no reason to believe that Bowles's friend had participated in the argument over the proposed sex-for-drugs trade or in the resulting battery of Mauldin or that she feared Bowles's friend. Further, Mauldin reported Bowles had fled the apartment before the officers arrived, and two other officers began to search the neighborhood for Bowles while Officer Swartz continued speaking with Mauldin. Thus, Officer Swartz had no reason to believe anyone in the apartment at that time posed a threat of domestic violence.

As Officer Swartz continued his conversation with Mauldin, Swartz learned the race of Bowles's friend but did not obtain a further description of him or learn his name. Officer Swartz made no inquiry concerning the friend's whereabouts and asked merely "if there was *anyone* else present in the apartment." (Emphasis added). When Mauldin nervously replied that a man she knew only as "C" was in the bedroom, Officer Swartz had no more than a hunch that "C" might be the friend with whom Bowles had hoped to engage in the drug transaction. Instead of asking Mauldin for additional information about "C," Officer Swartz walked toward the bedroom,

---

[5] Although we are not bound by concessions of law, see Epps v. Commonwealth, 47 Va. App. 687, 703, 626 S.E.2d 912, 919 (2006) (en banc), the Commonwealth conceded at the suppression hearing that the encounter constituted an investigative detention.

where he observed a fist-sized hole in the closed bedroom door right next to the doorknob. He testified he "just wanted to identify who was in [the bedroom] after seeing" the hole and that he entered without asking Mauldin for permission.

The mere presence of that hole in the bedroom door was insufficient to raise Officer Swartz's suspicion beyond a hunch. Officer Swartz made no inquiry of Mauldin regarding how long the hole had been present in the door or whether it had anything to do with the proposed sex-for-drugs trade. Further, Mauldin had reported nothing to Swartz to indicate that Bowles had exhibited any violence toward the friend with the cocaine or that Bowles had made any attempt to take the cocaine by force. Finally, when Officer Swartz entered the bedroom and asked "C" his name, Mauldin stated that he was not involved. Although Officer Swartz was not compelled to accept Mauldin's disclaimer as the truth, the other circumstances of which Officer Swartz was aware at that time did not give him reasonable, articulable suspicion to believe the contrary—that Lantion was, in fact, involved in the sex-for-drugs proposal. Swartz knew only the race of Bowles's friend who possessed the drugs and had no additional descriptive information. Finally, Officer Swartz lacked reasonable, articulable suspicion to believe Lantion likely was engaged in some other offense while he slept at Mauldin's apartment following a New Year's celebration at which the participants had imbibed.

Because I believe the evidence failed to establish reasonable, articulable suspicion to subject Lantion to the investigative detention that led to the discovery of drugs in his pocket, I would hold the trial court's denial of the motion to suppress was error. Accordingly, I would reverse Lantion's conviction.

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **3rd** *day of* **April, 2007**.

Craig M. Lantion,                                                                                    Appellant,

 against          Record No. 2617-05-4
                 Circuit Court No. FE-2005-867

Commonwealth of Virginia,                                                              Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On February 26, 2007 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on February 13, 2007, and grant a rehearing *en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered herein on February 13, 2007 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

Notwithstanding the provisions of Rule 5A:35, the following briefing schedule hereby is established:  Appellant shall file an opening brief upon rehearing *en banc* within 21 days of the date of entry of this order; appellee shall file an appellee's brief upon rehearing *en banc* within 14 days of the date on which the opening brief is filed; and appellant may file a reply brief upon rehearing *en banc* within 14 days of the date on which the appellee's brief is filed.  The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:    Judges Benton, Haley and Senior Judge Fitzpatrick
Argued at Alexandria, Virginia


CRAIG M. LANTION

                                                         MEMORANDUM OPINION[*] BY
v.        Record No. 2617-05-4               JUDGE JAMES W. BENTON, JR.
                                                         FEBRUARY 13, 2007
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Gaylord L. Finch, Jr., Judge

Laura E. Byrum (Petrovich & Walsh, P.L.C., on brief), for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


A jury convicted Craig M. Lantion of possession of a controlled substance, cocaine.

Lantion contends the trial judge erred in refusing his pre-trial motion to suppress evidence. We

agree and reverse the conviction.

I.

Under well established principles, when reviewing the trial judge's denial of Craig M.

Lantion's motion to suppress evidence, we must consider the evidence in the light most favorable to

the Commonwealth, the prevailing party at trial. Jackson v. Commonwealth, 267 Va. 666, 672, 594

S.E.2d 595, 598 (2004). So viewed, the evidence proved a police officer went to a residence at

10:30 a.m. on New Year's Day to investigate a report of a domestic assault. When the officer

arrived at the residence, the woman who made the report invited him into the living room. She told

the officer she and her boyfriend were having a party to celebrate the New Year when her boyfriend

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

grabbed her arm and neck after she refused his proposition that she have sex with his friend in exchange for cocaine. Her boyfriend fled the residence before the officers arrived. As she spoke to the officer in her living room, two other officers searched outside for her boyfriend.

As the officer conversed with the woman, he noticed she was disheveled but had no physical injuries. He testified the woman may have generally described the boyfriend's friend, but he "did not take any notes on that" and did not inquire whether the boyfriend's friend was still present or make any other inquiries about him. During the discussion, the officer asked her if anyone else was present in the residence. He testified she looked away from him and acted nervous. When he asked again, she said someone was in a bedroom. In response to the officer's inquiry about the person's name, she said it was "C."

The officer testified he walked with the woman to the bedroom. The officer opened the door to the bedroom and saw a man lying fully clothed and asleep on the bed. The officer woke the man and identified himself. During the encounter, the man rolled over and remained laying on the bed. When the officer repeatedly asked the man to identify himself, the woman interjected and told the officer the man "was not involved."

The man did not identify himself but asked the woman to get him a glass of water. After the woman returned with the water, the officer asked the man if he had any weapons. When he responded that he had a knife in his pocket, the officer "patted him down." The officer detected an object in the right front pocket and removed a pocketknife. He then "patted" the other front pocket, detected an object, and reached in to remove a second knife. The officer testified that when he removed the knife, he also removed the other contents of that pocket: money and a piece of cocaine wrapped in plastic. The officer then arrested the man and learned he was Craig Lantion.

Denying Lantion's motion to strike the evidence, the trial judge ruled as follows:

> I find that the officer had reasonable, articulable suspicion to
> engage in the encounter with [Lantion]. I think once he did, the

statement that [Lantion] made that he had a weapon justified his patting him down and taking the weapon from him, and I think in the course of that the drugs came out of the pocket as well along with that, and I think that that was all within the proper actions of a police officer investigating this particular -- the particular allegations that were made and in further investigating the circumstances once he arrived on the scene and, therefore, the motion to suppress is denied.

At the conclusion of the trial, a jury convicted Lantion of possession of cocaine.

II.

Lantion contends the trial judge erred in finding the officer had a reasonable articulable suspicion necessary to detain him. Acknowledging on brief that "[t]he prosecutor conceded at the suppression hearing that the initial encounter between [the officer and Lantion] was an investigative detention," the Commonwealth contends the detention was justified by the officer's reasonable belief Lantion "was the friend who was supposed to supply cocaine to [the woman's] boyfriend" and by the officer's further reasonable belief "a drug transaction might be afoot."

An investigative detention must be "supported at least by a reasonable articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). The United States Supreme Court has expressly held that reasonable suspicion means more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry v. Ohio, 392 U.S. 1, 27 (1968). In other words,

> to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field, . . . the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual . . . .

Brown v. Texas, 443 U.S. 47, 51 (1979) (citations omitted).

When a police officer detains an individual "for the purpose of requiring him to identify himself, [the officer has] performed a seizure of his person subject to the requirements of the

- 3 -

Fourth Amendment." Id. at 50. The objective facts in this record, however, simply did not support a lawful detention. Lantion's mere presence, asleep in the woman's residence after a New Year's party, did not create a reasonable suspicion he was involved in her dispute with her boyfriend. If a person's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," Illinois v. Wardlow, 528 U.S. 119, 124 (2000), the officer's belief, in this case, that a guest asleep in the closed bedroom was somehow involved in the woman's complaint was not a reasonable suspicion.

Moreover, when the officer identified himself to Lantion and asked Lantion to identify himself, the woman specifically told the officer Lantion "was not involved." Despite the woman's statement to the officer that the man asleep in the bedroom had no connection to the complaint she had made involving her boyfriend, the officer continued to question Lantion. In his testimony, the officer provided no basis upon which he could have formed a reasonable belief that the man who was asleep in a closed bedroom was somehow involved in the woman's complaint. The officer explained his reason for questioning Lantion about his identity as follows:

> In my mind, I believed that he was a friend, there was an assault that probably took place at that location, also a drug deal that probably was going to take place at that location.
>
> I believed when I saw him -- the reactions from [the woman], first not wanting to give me his name, that this could probably be the friend, the individual, that she had first mentioned.[6]

---

[6] The officer also testified that, before he entered the room, he observed a hole in the bedroom door. Even though the Commonwealth's brief and the officer's testimony both mentioned the hole, neither illuminated how this fact could have raised the inference that the person asleep in the bedroom was involved in the woman's complaint to the police. Indeed, the officer merely surmised someone "could" have made it in an attempt to unlock the door from inside of the bedroom. Thus, the only significance of the hole in the door was that it added to the police officer's "inchoate and unparticularized suspicion." See Terry, 392 U.S. at 27.

Yet, when the officer was in the living room he had not asked the woman the name of the person whom her boyfriend had sought to involve. He also had not asked if the person was still in the residence. The officer cannot rely upon his own lack of inquiry to justify this intrusive detention.

The woman's clear statement to the officer that the man "was not involved" is significant. The presence of a man asleep in the bedroom was not a matter so unusual as to cause a reasonable belief the woman was falsely giving information about "C." After all, she called the police to make a complaint about the assault. Nothing in the record supports an inference that the woman, who had initiated contact with the police about the prior assault in her residence, would provide false information when they responded to her call. In view of the woman's specific identification of "C" as someone who "was not involved," the officer's contrary belief was unsupported. The officer's belief that Lantion was involved in the woman's dispute with her boyfriend, a belief that was more an "inchoate and unparticularized suspicion or 'hunch,'" Terry, 392 U.S. at 27, than a fair inference, "is simply too slender a reed to support the seizure in this case." Reid, 448 U.S. at 441. Reasonable suspicion is more than guesswork and supposition. See id. (concluding that the investigator's "belief that the petitioner and his companion were attempting to conceal the fact that they were traveling together" was an "unparticularized suspicion" and not a fair inference).

Additionally, even if we were to assume the initial detention was lawful, the officer's frisk of Lantion for weapons was not supported by a reasonable belief he was armed and presently dangerous, which is the standard that must exist to form the predicate for a frisk for weapons.

> An officer may conduct a pat-down search for weapons if the officer can point to specific and articulable facts which reasonably lead him to conclude that criminal activity may be afoot and that the person subjected to the search may be armed and dangerous. See James v. Commonwealth, 22 Va. App. 740, 745, 473 S.E.2d 90, 92 (1996). The authority to conduct a pat-down search does

> not follow automatically from the authority to effectuate an investigative stop. See Williams v. Commonwealth, 4 Va. App. 53, 66, 354 S.E.2d 79, 86 (1987). "Only where the officer can 'point to particular facts from which he reasonably inferred that the individual was armed and dangerous' is he justified in searching for weapons." Id. at 66-67, 354 S.E.2d at 86 (quoting Sibron v. New York, 392 U.S. 40, 64 (1968)). See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979) (stating that the United States Supreme Court's holding in Terry does not authorize "a generalized 'cursory search for weapons'" and "does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked").

Harrell v. Commonwealth, 30 Va. App. 398, 403-04, 517 S.E.2d 256, 258-59 (1999). In other words, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. The requirement that the circumstances support the reasonable belief that the individual is armed *and* presently dangerous is a dual one. See id. at 7, 28 (where the police officer patted down individuals who he believed were in the middle of planning a daylight robbery). A reasonable suspicion that an individual possesses a weapon does not automatically raise the suspicion that the person is presently dangerous.

When the officer opened the door and saw Lantion asleep on the bed, he had no reason to believe Lantion was dangerous or posed a threat to him. The officer testified that after he woke Lantion and identified himself as a police officer, Lantion merely rolled over and looked at the officer. The officer expressly testified that Lantion made no threatening gestures while he was lying on the bed. Under these circumstances, Lantion's possession of a pocketknife in the bedroom of the private residence did not establish dangerousness.

The officer had no reasonable belief that Lantion was involved in a drug transaction with the boyfriend. The officer articulated the basis for the search of Lantion by stating, "He just wouldn't respond to who he was." The Supreme Court, however, has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification

- 6 -

needed for a detention or seizure." <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) (citing <u>Brown</u>, 443 U.S. at 52-53); <u>see also</u> <u>United States v. Flowers</u>, 912 F.2d 707, 712 (4th Cir. 1990) (noting that a defendant has "the right to refuse to speak with . . . officers, who in turn possess no right to detain citizens who decline to talk or otherwise identify themselves"). Simply put, a person's refusal to talk to a policeman is not a sufficient basis "to establish reasonable suspicion that criminal activity is afoot[, and,] in the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety." <u>United States v. Burton</u>, 228 F.3d 524, 529 (4th Cir. 2000). Lantion was under no obligation to identify himself to the officer, and his refusal to do so did not support the inference that he was armed and dangerous. <u>See</u> <u>id.</u> (holding that the defendant's refusal to talk to police and remove his hand from his pocket did not establish a reasonable suspicion).

For these reasons, we hold the trial judge erred in denying the motion to suppress the evidence. We, therefore, reverse the conviction and dismiss the indictment.

<u>Reversed and dismissed.</u>

Haley, J., dissenting.

I respectfully dissent.

<u>Investigative Detention</u>

As the majority notes, "An investigative detention must be 'supported at least by a reasonable articulable suspicion that the person seized is engaged in criminal activity.'" (quoting <u>Reid v. Georgia</u>, 448 U.S. 438, 440 (1980)). Specifically, this Court has explained, "An investigative detention to detect or prevent incipient criminal activity is, when supported by the officer's reasonable and articulable suspicion that criminal activity may be afoot, consonant with the [F]ourth [A]mendment protections against unreasonable searches." <u>Layne v. Commonwealth</u>, 15 Va. App. 23, 25, 421 S.E.2d 215, 216 (1992). Where the officer can articulate facts to support his suspicion, the officer may briefly detain the individual "in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." <u>Hayes v. Florida</u>, 470 U.S. 811, 816 (1985); <u>see also</u> <u>Williams v. Commonwealth</u>, 4 Va. App. 53, 64, 354 S.E.2d 79, 85 (1987).

When evaluating whether an investigative detention is unreasonable, the court should make an "objective assessment of the totality of the circumstances." <u>Waugh v. Commonwealth</u>, 12 Va. App. 620, 622, 405 S.E.2d 429, 430 (1991). In doing so, "common sense and ordinary human experience must govern over rigid criteria." <u>United States v. Sharpe</u>, 470 U.S. 675, 694 (1985). A reviewing court should also consider the officer's training and experience, which may allow him "to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." <u>Brown v. Texas</u>, 443 U.S. 47, 52 n.2 (1979). However, "any such special meaning must be articulated to the courts and its reasonableness . . . assessed independently of the police officers' subjective assertions." <u>United States v. Gooding</u>, 695 F.2d 78, 82 (4th Cir. 1982). Finally, we have held that "[a]ctual proof that criminal activity *is* afoot is

not necessary; the record need only show that it *may* be afoot." Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992) (emphasis in original).

In the case at hand, at the hearing on the motion to suppress the cocaine, Officer Swartz articulated several facts that justified his brief detention of appellant. Officer Swartz explained that the woman told him she was partying the night before with her boyfriend and a friend. She stated that her boyfriend "had worked out an agreement where she would prostitute herself to the friend – have sex with him for a $50 rock of cocaine." The woman did not identify or describe the friend to Officer Swartz. Officer Swartz explained his interaction with the woman and appellant for the court:

> A. I had asked [the woman] if there was anyone else present in the apartment and . . . at first she looked away from me, became nervous, started moving back and forth and I asked her a second time. She said there was somebody in the bedroom, and I asked her what the name was, and the only thing she could provide me was "C." She could not give me a last name. She could not give me a full name, just the name "C."
>
>        *      *      *      *      *      *      *
>
> Q. So, [the woman] walked you back to the bedroom. What happened from that point?
>
> A. I observed a hole punched right next to the bedroom. I opened the door. I saw [the appellant] laying on top of the bed fully clothed.
>
> Q. This hole through the wall, what did you – what was going through your mind when you saw that hole?
>
> A. Actually, it's a hole through the door, right next to the doorknob. To me, somebody – it could have been a locked door and somebody was trying to get – to unlock it from the inside.
>
>        *      *      *      *      *      *      *
>
> Q. [W]hat was going through your mind with respect to this [d]efendant's involvement in the original call out and the story that [the woman] had told you?

A. In my mind, I believed that he was a friend, there was an assault that probably took place at that location, also a drug deal that probably was going to take place at that location. I believed when I saw him – the reaction from [the woman], first not wanting to give me his name, that this could probably be the friend, the individual, that she had first mentioned.

In the line of testimony quoted above, Officer Swartz sufficiently articulates his reasonable suspicion that appellant was engaged in criminal activity. Officer Swartz first became suspicious after the woman reacted nervously to his questions regarding the identity of the man in the bedroom. See United States v. Mayo, 361 F.3d 802, 805-06 (2004) ("[R]elevant to the totality of circumstances are various individual factors . . . such as . . . whether the suspect engaged in evasive behavior or acted nervously."). His suspicions increased when the woman was unable to provide the man's name. Officer Swartz then walked to the bedroom with the woman, where he observed a fist-sized hole punched through the door, next to the doorknob. When Officer Swartz opened the bedroom door and found appellant on the bed, he immediately became concerned that appellant was the friend described by the woman as participating in a sex-for-drugs scheme with her boyfriend.

I disagree with the majority's holding that Officer Swartz did not have reasonable articulable suspicion to briefly detain appellant because the woman told Officer Swartz that appellant "was not involved." The majority makes this determination despite the fact that the woman made a domestic assault complaint, she acted nervous during his interview, she told Officer Swartz that her boyfriend attempted a sex-for-drugs transaction at the apartment, there was a fist-sized hole in the door to the bedroom where appellant was located, and appellant did not respond to questions about his identity.[7] Only after all of these factors occurred did the

---

[7] The majority is correct that the Supreme Court has "consistently held that a refusal to cooperate, *without more*, does not furnish the minimal level of objective justification needed for a detention . . . ." Florida v. Bostick, 501 U.S. 429, 437 (1991) (emphasis added). However, in

woman instruct Officer Swartz that appellant "was not involved." The totality of the circumstances, therefore, clearly points to Officer Swartz's reasonable articulable suspicion that appellant *may have been engaged in criminal activity* to justify the investigative detention.

Moreover, Code § 19.2-81.3 appears to encourage, if not require, Officer Swartz's brief investigative detention of appellant. That statute states, "Any law enforcement officer . . . may arrest without a warrant for an alleged violation of [domestic violence] regardless of whether such violation was committed in his presence, if such arrest is based on probable cause . . . or *upon personal investigation*." (Emphasis added). The General Assembly enacted Code § 19.2-81.3 "[i]n recognition of the difficulty of protecting against domestic violence." McCracken v. Commonwealth, 39 Va. App. 254, 261 n.4, 572 S.E.2d 493, 496 n.4 (2002). No doubt, many individuals are afraid to take criminal action against an abusive spouse, for fear of retaliatory abuse in the future. Code § 19.2-81.3, therefore, authorized Officer Swartz to investigate the situation at hand in response to the woman's earlier report of domestic assault.

Considering the totality of the circumstances, and viewing the evidence in the light most favorable to the Commonwealth, it is clear that Officer Swartz possessed a reasonable suspicion that appellant *may* have been engaged in criminal conduct to warrant a brief investigative detention.[8] See Harmon, 15 Va. App. at 444, 425 S.E.2d at 79.

the case at hand, appellant's refusal to respond to Officer Swartz's questioning was just one of many factors that contributed to his reasonable suspicion.

[8] We offer the following offenses as examples of crimes of which, based on the instant facts, Officer Swartz might have reasonably suspected appellant guilty: possession of a controlled substance, Code § 18.2-250; attempted distribution, Code § 18.2-257; and solicitation of a prostitute, Code § 18.2-346(B).

Pat-Down Search

The majority states, "[E]ven if we were to assume the initial detention was lawful, the officer's frisk of [appellant] for weapons was not supported by a reasonable belief he was armed and presently dangerous." That conclusion is incompatible with the record.

During an investigative detention, an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also Hatcher v. Commonwealth, 14 Va. App. 487, 494-95, 419 S.E.2d 256, 260 (1992). After questioning the individual, if the officer maintains a reasonable articulable suspicion that the detainee is involved in criminal activity and that he is carrying a weapon, the officer may conduct a brief "pat-down" search for his own safety. Terry, 392 U.S. 1, 30 (1968).[9]

The Supreme Court of the United States explained the justification for such a pat-down search in their holding in Terry:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

---

[9] In their analysis, the majority relies on our decision Harrell v. Commonwealth, 30 Va. App. 398, 403-04, 517 S.E.2d 256, 258-59 (1999). The officer in Harrell, however, testified that "at no time during the encounter with appellant, did he have reason to believe appellant was armed." Id. at 401, 517 S.E.2d at 257. In the case at hand, appellant explicitly informed Officer Swartz that he had a knife in his pocket, making the instant case clearly distinguishable from the facts, and the holding, in Harrell.

Id.  See also Florida v. J.L., 529 U.S. 266, 269-70 (2000); Adams v. Williams, 407 U.S. 143, 146 (1972); Murphy v. Commonwealth, 264 Va. 568, 573-74, 570 S.E.2d 836, 839 (2002); James v. Commonwealth, 22 Va. App. 740, 745, 473 S.E.2d 90, 92 (1996).  To conduct a pat-down search, the officer "does not have to be absolutely certain that the person is armed."  Simmons v. Commonwealth, 217 Va. 552, 556, 231 S.E.2d 218, 221 (1977).  Rather, if a "reasonably prudent man in the circumstances" would similarly believe that "his safety or that of others was in danger," the search is justified.  Terry, 392 U.S. at 27.

In determining whether the officer acted reasonably, the court should consider several factors, such as the characteristics of the area in which the stop occurred, the time of day, the conduct and demeanor of the suspect, and the type of offense that the officer was investigating.  United States v. Bull, 565 F.2d 869, 870-71 (4th Cir. 1977), cert. denied, 435 U.S. 946 (1978); see also Williams v. Commonwealth, 4 Va. App. 53, 66-67, 354 S.E.2d 79, 86-87 (1987).  The court also should give due weight to the officer's training and experience in evaluating whether his suspicion was reasonable under the circumstances.  Id.; Terry, 392 U.S. at 27.

In this case, Officer Swartz articulated reasonable suspicion that appellant was engaged in criminal activity and was armed and dangerous.  During the investigative detention, Officer Swartz identified himself as a police officer and asked appellant, several times, to identify himself.  Appellant only stared at Officer Swartz and refused to respond.  Officer Swartz has been a police officer in Fairfax County for four years.  At the hearing on the motion to suppress, Officer Swartz testified that he understands the well-recognized relationship between the distribution of drugs and the possession and use of dangerous weapons.  See Logan v. Commonwealth, 19 Va. App. 437, 445, 452 S.E.2d 364, 369 (1994) (en banc).  Officer Swartz stated, "[T]hrough my training we were taught that whenever there's narcotics that there's a high possibility that weapons would also be in that location and, being the only officer in that room,

- 13 -

my senses were heightened." Therefore, Officer Swartz next inquired whether appellant was carrying any weapons.

Appellant *told* Officer Swartz that he had a knife in his pocket. At this point, Officer Swartz possessed sufficient evidence to pat down appellant, based on appellant's own statement that he was carrying a knife.[10] Officer Swartz testified that he patted down appellant for his safety, and to determine whether he had any other weapons. Officer Swartz was the only officer present at the scene. A reasonably prudent police officer, under these circumstances, would have reacted similarly for his own protection.

Officer Swartz's conduct, therefore, was exactly consistent with the requirements outlined in Terry. The pat-down search, therefore, falls squarely within the permissible boundaries prescribed by the Fourth Amendment.[11]

<u>Scope of the Search</u>

A valid pat-down search "must be limited to that which is necessary for the discovery of weapons." Terry, 392 U.S. at 26. This Court has stated, "If, during the pat-down search, the police officer feels an object that he reasonably believes could be a dangerous weapon, the officer may seize the object from the suspect's person." Phillips v. Commonwealth, 17 Va. App. 27, 30, 434 S.E.2d 918, 920 (1993); see also Lansdown v. Commonwealth, 226 Va. 204, 213, 308 S.E.2d 106, 112 (1983), cert. denied, 465 U.S. 1104 (1984).

---

[10] "Response to police questioning . . . frequently is an ingredient in the probable cause determination." Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.6(f) (4th ed. 2004). If an individual's answers to an officer's questions can establish "probable cause," then *ipso facto* such an answer can establish a "reasonable articulable suspicion," the latter term subsumed within the former. If an individual says he has a weapon on his person, a pat-down search is justified under either standard.

[11] The fact that appellant's weapon turned out to be a pocketknife, which does not fall within the definition of prohibited weapons in Code § 18.2-308, does not affect the validity of the pat-down search. See Simmons, 217 Va. at 556, 231 S.E.2d at 221.

In determining whether the search was reasonable, the trial court must consider whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20. It is irrelevant whether the object removed from appellant's pocket was, in fact, a weapon. Rather, "[t]o justify its removal, it [is] only necessary that the officer reasonably believed that the object *could be* a weapon." Simmons, 217 Va. at 556, 231 S.E.2d at 221 (emphasis added).

The United States Court of Appeals for the District of Columbia Circuit has held that, when an officer conducting a pat-down search reasonably believes the individual is carrying a weapon, it is "reasonable . . . for him to reach his hand into [his] pocket and remove the contents." United States v. Dowling, 271 A.2d 406, 408 (D.C. Cir. 1970). In Dowling, the officer felt what he believed to be a gun in the defendant's pocket. He then removed the contents of the pocket. He found several items, but he did not find a gun. The defendant, however, was arrested for possession of numbers slips. The court found such a search "rests on adequate constitutional grounds." Id. at 408-09.

In the case at hand, Officer Swartz conducted a pat-down search after appellant told him he had a knife in his pocket. Officer Swartz stated at trial, "For my safety I patted him down. In his left pocket I felt what appeared to be a knife. I pulled that object out and it was a black pocket knife. I patted down his right side. I felt what appeared to be another knife." Officer Swartz then "reached in and grabbed everything in the pocket and pulled it all out . . . . The knife was within all the other items."

Viewing the evidence in the light most favorable to the Commonwealth, I find that Officer Swartz did not exceed the scope of a legal search when he removed the contents of appellant's pocket. The knife was "within all the other items," and the search was necessary for his protection.

<u>Conclusion</u>

In <u>Ornelas v. United States</u>, 517 U.S. 690, 699 (1996), the United States Supreme Court set forth the following standard for reviewing motions to suppress:

> [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hastened to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

<u>See also</u> <u>Kyer v. Commonwealth</u>, 45 Va. App. 473, 479, 612 S.E.2d 213, 216-17 (2005) (en banc).

For the above stated reasons, I would uphold the trial court, finding: (1) Officer Swartz had reasonable, articulable suspicion to warrant an investigative detention; (2) Officer Swartz had reasonable, articulable suspicion to affect a pat-down search for his protection; and, (3) the scope of the search was within the permissible boundaries proscribed by the Fourth Amendment.